The first case, Vigil v. Take-Two Interactive. May it please the Court. Appellants have standing because Take-Two Interactive invaded their privacy by secretly misappropriating and storing their biometric identifiers in the form of digital maps of their facial geometry. Generally speaking, the Biometric Information Privacy Act, or BIPA, requires private entities such as Take-Two to obtain informed consent prior to collecting an individual's biometrics and also includes various procedural safeguards concerning the use and storage of that data after it's been initially collected. You just said secretly, right? That's correct, Your Honor. In paragraph 28 of your complaint, you agree that they were presented, at least he was presented, with a screen that says your face scan will be visible to you and others you play with and may be recorded or screen captured during play and that you consent to such use. How is it a secret? I thought your argument was that the in-writing requirement was not satisfiable. There was no big secret here that they were capturing the images, right? There was no secret they were capturing the images, Your Honor. That is correct. But the face scan that's disclosed in that disclosure is not the biometric identifiers that's at issue in this case. The face scan that was disclosed is an image, a picture or a rendition that appears on the basketball player's face during game play. How is this, though, meaningfully different from Tattoo's notice that it would be conducting a face scan? So a face scan, again, is just a process that the appellants and any reasonable person would understand as the process by which a rendition is created. What's not disclosed is that biometric identifiers, specifically geometric maps of points and contours on the face that are so unique that they can identify a person just in the same way a fingerprint can. Is there any allegation, just to follow up on that, that the rendition that has been compromised is imminently likely to be compromised? Well, the biometric information in this case are the renditions because they're based upon the facial or the biometric identifiers that are collected. There's no allegation that the identifiers have been misappropriated or compromised beyond Take Two, further downstream. But Take Two itself misappropriated the biometric identifiers from the appellants in the first incidence by collecting them without providing them any notice that there was biometrics, biometric identifiers, or any facial geometry, which is really what is required by the statute, specifically required by the statute. So I want to understand what you've just said. Are you saying that there is no risk of real harm to the concrete interests here? No. To the contrary, Your Honor, there's a direct harm to the concrete interest of biometric privacy because the biometric identifiers are being collected without the consent, the informed consent, or the written informed consent of the appellants. So the 15-minute scan that each plaintiff and his sister went through with the camera on their computer, what did they think that was going on? And then when it appeared on a basketball player's head, when they were playing games with other users, where do they think they got that information from, that image? They were fully aware, and indeed they wanted the image on their head. What they didn't want was, and they didn't know about, was their biometric identifiers being created in the process. So we're really talking about two different types of data here. One is the renditions on the players. And that, we don't dispute for purposes of this argument, that that was disclosed. And some form of notice was provided that the renditions were going to be on the players and that that's what the scan process was going to create. And they were going to be visible during gameplay, and there could be a screen capture of that. But the second type of data is the underlying building block that take two years to get there, which is a biometric geometric map of the face that's not disclosed. No reasonable person would have understood that to be taking place based upon that disclosure. Your contention, or your claim, is that that itself is a form of identity theft? Absolutely. Absolutely. Is that your claim? It's a collection of a biometric identifier in and of itself. Absolutely. The statute, Section 15B of the statute makes this point very clear that, and I quote, no private entity may collect, capture, purchase, or otherwise obtain a person's or a customer's biometric identifier or information unless it first informs the subject in writing that the biometric identifier or information is going to be collected and stored, and additionally receives a written release informing the person that the biometrics are being collected and stored. And that's the heart of this case. How is that a substantive violation? How is that a concrete or real harm? If they had the disclosure in paragraph 28 that just said your face scan is going to be captured and it's going to be transmitted to others, and it says by hitting the continue button, you agree to this, how is there a concrete injury there other than a procedural one about it maybe complying with the in writing part of the statute? Starting with the concrete interest of the statute, biometric privacy. Biometric, that is indisputably the concrete interest of the statute because the statute prohibits the collection of such personal and private information as their biological makeup of a facial feature. So that's what the statute was designed to prohibit. That, in the first instance, is what the statute prohibits. All of the other statutory provisions only are triggered after that initial collection. Okay? And so because their biometrics were collected without disclosing that it was being collected, that concrete interest in the privacy of that material has been violated in the process. There's no gap between the violation and the harm to the concrete interest. Is there any use, unauthorized use of this data that you are alleging? Well, we allege that the data is stored indefinitely in terms of being used. We allege that it's transmitted on an unsecure network to Take-Two in the first instance and then it's stored there indefinitely so that it can be used down the line to create additional avatars of the same person if necessary. Are you alleging that Take-Two is not adhering to any of the protocols or its internal procedures? That's correct, Your Honor. Or that's inadequate? That's correct, Your Honor. The complaint specifically alleges that essentially all of the procedural safeguards in the statute are being violated, including the requirements in the statute that the data be secured with the same safeguards that the company would secure its other confidential data. I understood that you were saying that they had not notified you. That's not the same thing as saying that they lack protocols or that they're not adhering to protocols. That's correct. For the initial collection, just to be clear, there's no information or disclosure being provided that it discloses the biometrics are going to be collected. There's additionally no written release or informed consent received from the individual providing their biometrics. There's absolutely no compliance with the core of the statute, which is the unauthorized collection provision. In terms of retention and the provision of data retention policies and destruction policies and information about the length of term for which biometrics are going to be stored, that was likewise not provided to the individuals. As a result, they've been left totally unaware of where their biometrics are, how long it's going to be stored on Take-Two's unsecured remote server, and they've actually withdrawn from engaging in these types of biometrics-facilitated transactions going forward in view of these procedural violations and, indeed, the initial substantive violation committed by Take-Two. Doesn't the statute provide certain time constraints? It does. It requires that the data be stored. It requires a first policy. Is it a three-year? Right. Exactly. A three-year maximum. And is there anything at all that suggests that Take-Two is not adhering to that three-year policy? Well, we have absolutely no indication that there was any policy provided. In terms of their adherence to the policy, the complaint alleges that it's being stored indefinitely. And, indeed, that's the way it appears based upon the way the game works. At any point in time, a new avatar can be created. So you're saying that Take-Two goes beyond the three-year statutory provision? The complaint alleges that it's stored indefinitely because they've provided no notice of how long they're storing it. We don't have discovery. We haven't been able to determine exactly how long it's being stored. But based upon our understanding of the technology and the way it's designed to work, it's stored there until the game is for the end of time. I mean, there's no indication of how long it's being stored. At least that's the allegation. That's what you're saying. That's the allegation of the complaint. Correct, Your Honor. Thank you. You'll have two minutes in rebuttal. Thank you. So the question is whether or not, without any allegation of harm, and just the bare statutory alleged violations, there's sufficient article 3 standing for the plaintiffs to proceed. And the district court did an analysis that was focused on each particular alleged violation. And, ultimately, plaintiffs say that they have five alleged violations. They really group into three categories. In terms of the first three, they're all what I would call sort of notice and consent provisions. And what the district court did was really probe, as Your Honors just did, the plaintiffs were, what are you saying happened in this case in terms of notice and consent and authorization? And as plaintiffs just readily admitted again, they admit there was a notice that said face scan. They admitted that they stood there as their face got scanned. They admitted that they saw the avatars being played as they played with other people. I guess the argument that we heard is that it's one thing to be told that your face scan will be retained. It's another thing to be told that your biometric information, whatever that is, will be retained. And collected and retained. Yeah, and ultimately what it boiled down to was the word. The district court asked, because if you look at the definition of biometric identifier in the statute, it defines it as a face scan. I think the only word that's missing is the word geometry. And so the way it ended up, the violation was described as, oh, well, I guess maybe it's a violation that you didn't use the word geometry when you said face scan, or maybe you didn't use the word biometric identifier. Now, I would argue, Your Honor, I don't think the statute even says you have to use magic words, but let's assume for the moment that is the violation. What the district court correctly found is that's your quintessential procedural type of violation or procedural type of rule. There is no indication that the Illinois legislature gave some magic significance to certain words or was so concerned about the particular method of the consent that they elevated it to its own concrete interest in and of itself. Rather, what the district court found is, look, these are just words that are put in place with the ultimate goal of making sure people get their biometric information protected. And so the question that they had to confront was, where's the material risk that there's any chance that that information is to be compromised, particularly here where there's no allegation of any misuse or data breach whatsoever? And I think what makes this case an easy case or made it easy for the district court was ultimately the concessions at the argument and the admissions and the complaint that they knew their faces were being scanned. And as a result, everything else became sort of a technical procedural violation in terms of the mechanics of the notice. Can I ask you about data breach? I understand you to say, and please correct me if I'm misunderstanding, that there can't be standing under Section 1415E without an actual data breach. Is that correct? Is that your position? So our position on that, the E one is saying that they have to have basically reasonable means of protecting the information. And my position, because there has been no discovery on what protocols are in place or who are taking the allegations, is true. The cases are pretty clear that if the concern is compromise of private information, there at least has to be a data breach before you can say there's a material risk of harm. Well, let's say that a company decides to get rid of all of its data security measures and it holds the biometric data in its possession unsecured. Are you saying that there can't be standing until there's an actual breach? First of all, obviously I think we're aware that's not the allegation here. But in that hypothetical situation, I think the current cases, the way the circuits have come out on this, I do think it would be very difficult to articulate Article III standing in that instance. I think most recently the Third Circuit in Beck literally just canvassed the circuit split on this issue in terms of how much of a risk there has to be for identity theft before you can have standing. And it acknowledged a couple of circuits on one side saying, look, if you have a data breach, that's enough. You don't have to show more. And identified several other circuits saying, even with a data breach, with hackers, you need more before you can have standing. The one common theme on all of those cases, though, in every circuit that's addressed it, is there at least has to have been a breach or at least some data compromised by some kind of hacker. We looked and we're not aware of a single circuit or district court saying you can have standing on the mere allegation that maybe you're not taking enough safeguards, even though you have no allegation that anything has been stolen, anything has been breached, anything has been taken, or that anyone's even trying. And I think that's why it makes this case much easier than the hypothetical Your Honor presents. What do we make of footnote 5 in the Clapper decision that says that Article 3 standing, I'm quoting, also exists where there is a substantial risk that the harm will occur which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm? You don't cite that in your when you talk about Clapper. Could you tell me what your understanding of footnote 5 is? My understanding is that that acknowledges certain, the possibility in certain instances where you have prospective harm that is concrete enough where I think it's reasonable to have some kind of mitigation or corrective action. And if that's taken, that that might itself furnish enough of a harm for there to be standing. Without having, you know, looking at elaborately, I do believe courts have come out all over the place on the circumstances that would warrant such standing in terms of when it's appropriate to look at monitoring or corrective or protective measures in order to furnish the concrete harm. In this case, because there's nothing even remotely suggesting anyone's even tried to break in to get this data or any suggestion that any instance has even arisen that would warrant protective measures, I don't think that footnote ultimately gives rise to the circumstance at all. So your position is, as I take it, that with respect to the standing concerns, that we don't really have to get into it very much because in your view, there has not been a showing that there is any risk of harm. Correct. I think in this instance, there basically is zero risk of harm because there have been no allegations of several key facts. One, as the district court made clear, no allegation of data breach whatsoever. There isn't even an allegation that anyone's even trying to get to this data. Without the allegation of any kind of effort or any risk of it being compromised, we're left with a purely academic question of what might be reasonable in the abstract, right? They want you to sort of, the court to potentially answer, well, is encryption required or not required, et cetera, et cetera, et cetera. I think what the standing law indicates is until you actually have a concrete or at least something that's being threatened, you don't have to answer these abstract questions. I would agree, though, that if the disclosure had failed to disclose that the scan, however you want to describe it and however it's defined in the statute 1415, if the disclosure had failed to disclose that the scan would be retained, that they would then have some standing to sue for in connection with just the collection. Oh, Your Honor, I would say even prespokio, that kind of a situation where it's purely surreptitious collection of private data, I think it would be considered traditional invasion of privacy. I don't think you would even need to go into that kind of struble, concrete interest analysis. I do agree in that instance there would be standing. But here, what the court correctly noted was it's not really an unauthorized collection of information. It's more a question of procedurally, did you do it exactly the way that the statute prescribed? And in those instances, in looking at the concrete interest, you have to say, okay, what was that procedure designed to safeguard and is there a material risk of harm to that? And I think in this case, there's not. Can I ask you about what the district court did here, which was to dismiss the case with prejudice under 12b-6 after concluding there was no subject matter jurisdiction under 12b-1. That's unusual. Was it appropriate to do that or should it have been dismissed without prejudice on 12b-1 grounds? Yeah, well, the reason why I think it's somewhat unusual is because the court was dealing with a state statute that itself requires a person be aggrieved in order to bring a case. So what was unusual about this case is it wasn't just lack of Article III standing, which gets you out of federal court, but also from the basically the same analysis of recognition that there could never be a state claim whatsoever. Now, I guess I would separate that question in terms of authority and ultimately should the court have done it. I think it's clear, one, that generally if you don't have subject matter jurisdiction, you don't reach the merits. But based on the Supreme Court's Steele Code decision, and this circuit's following an entry Facebook more recently, there is an exception for that when we're talking about threshold questions of who is entitled to sue. Sometimes it's called statutory standing. It's an ambiguous term. People don't like that term. But the Supreme Court does say threshold issues, you have the discretion to choose, you have inherent jurisdiction to get rid of a case for that. It says only under certain circumstances. Correct. Which I think is important. Yeah, so the question then becomes, I think, not less a question. What are those circumstances? So to me, I think the standard that was adopted by this court in entry Facebook is whether or not there is an abuse of discretion and the court choosing which threshold ground to rule on, right? In fact, I think the entry Facebook case explicitly uses an abuse of discretion standard. But in the environmental renewal versus pyramid Crossgate's case, the court held, and this is, I'm quoting, where the party's standing arguments are based on different constructions of the governing statute, plaintiff's standing to bring this action turns on the merits of the action itself and therefore may not be decided without subject matter jurisdiction. But I think that's because in those instances, that comes the dividing line between when is it really merits and when is it truly a threshold question, right? And the way the Supreme Court explained the distinction between the two is, it uses the phrase, it's a threshold question we're talking about who is entitled to bring suit versus is what is complained about actually something that's prescribed by the statute. If it's a threshold question, the court says, one, you have the authority, and then I would argue in entry Facebook, the court has the authority to get rid of the case. So I think this court acted with sufficient discretion. A case has been around for two years because the conclusion flows from the same lack of harm. It's literally the same analysis on both. And I think just simply in the name of judicial efficiency, I don't think the court abused its discretion in reaching both issues. It certainly could have just reached person aggrieved without doing Article III altogether. I think it did both because it's literally the same analysis. And for that reason, I think the case is up. Thank you, Your Honor. Just briefly before I address the dismissal with prejudice issue, I'd just like to go back briefly to the distinction I was drawing between the face scan and the underlying data that is the biometrics we're alleging was compromised by take two in this case. Page nine of take two's brief actually articulates it best where it states, the avatar or the facial rendition was disclosed and disseminated to other players. To be accurate, their avatars were visible to others, but the underlying scan data from which their avatars were created was not. So take two acknowledges the distinction exists that we're making here. The underlying data is what are the biometrics in this case. And that was plainly not disclosed in the disclosure. Where in 1415 or where in the statute is biometric identifier defined? And how is it defined? It's defined as a scan of face geometry among other terms. But how is that different from a facial scan? Well, for one, Your Honor, the statute specifically requires in section 15B that a biometric identifier or biometric information be specifically disclosed as being collected. But additionally, the term face scan in the context in which it was used is not the same as scan of face geometry, because it's the geometric component of this digitized computer code that makes something a biometric identifier. And indeed, a face scan is visual, but a biometric identifier is not. And the disclosure says your face scan will be visible to other gamers during gameplay and maybe screenshot it. Well, that could not happen with a biometric identifier in the form of a scan of face geometry. It could only happen to a rendition. So that's reasonably what the plaintiffs, the appellants, understood the disclosure to mean. Do you allege anywhere in your pleadings that the omission of the term geometry made a difference? Well, I don't. Yes, I believe there are allegations that the collection of a scan of face geometry was not disclosed to the plaintiffs. What is that? I believe 73 and 74, paragraphs 73 and 74 of the second amended complaint. You say take two that had Ricardo Vigil known that take two would collect his unique biometric identifiers and or biometric information without his informed consent, he would not have purchased the NBA 2K15 video game. And I understand that that may be true, but my question really is, you don't allege that the omission of the word or that take two's omission of the term geometry is what actually led plaintiffs to unthinkingly or unwittingly turn over their biometric identifiers? We may not specifically phrase it in that way, Your Honor, but paragraph 73 says take two failed to properly inform plaintiffs in writing that their biometric identifiers were being collected and stored. So the biometric identifiers are defined in the statute, and the disclosure that was provided is also in the complaint. And we allege that that failed to adequately put them on notice that the biometric identifiers, which again are defined as scans of face geometry, were being disclosed. And so that's the distinction is one is based upon geometric points and contours on a face and is a digital map that is not visual, that cannot be visible to others during gameplay. And the other is the rendition that's used, that's created from that underlying data. We're saying it was being stored, it was collected, and take two put nobody on notice of that and the way that disclosure was written, even though it may use the word scan. With respect to the article three . . . excuse me, the dismissal with prejudice, none of the cases cited by take two involve a situation in which the district court first finds that the court lacks subject matter jurisdiction based upon a lack of article three standing and then nonetheless reaches the merits on a statutory standing or a motion to dismiss for failure to state a claim and dismisses with prejudice. Indeed, once the court finds that it lacks subject matter jurisdiction, it has no power to do anything except dismiss. And that makes sense because article three standing is ultimately a principle of judicial restraint to avoid going into territory where it need not go, into the political and the executive and legislative branches. But that's what the district court did here after finding it lacked subject matter jurisdiction and it was powerless to do anything but to dismiss the complaint without prejudice and nonetheless decided to interpret a state statute that it didn't have to undertake that. Let's say we agree with you. What are your options? Assuming you find that the court lacked subject matter jurisdiction because the plaintiffs lacked standing, the court should at that point vacate or remand and vacate the second section of the order pertaining to the statutory construction analysis in order to dismissal without prejudice of the complaint. And then what are your options? I guess my follow-up is what are your options then? So then the options are to seek redress for this, what we alleged in the complaint, in state court where article three is not a necessarily incorporated into the particular state constitutions. Thank you. Thank you. Thank you both for your arguments. The court will reserve decision.